688

## R. U. V. ENGINEERING CORPORATION v. BORDEN CO.

### No. 37, Docket 20722.

United States Court of Appeals
Second Circuit.

Nov. 8, 1948.

Bohleber, Fassett & Montstream and William Bohleber, all of New York City (Francis H. Fassett and John M. Montstream, both of New York City, of counsel), for appellant.

Fish Richardson & Neave and Maxwell Barus, all of New York City, for appellee.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

Judge Coxe's opinion in the District Court[1] states the facts so fully that we need not repeat them here; and, indeed, we follow so closely his discussion of the invalidity of the claims because of their variance from the original disclosure, that it is perhaps doubtful whether we can add anything useful to what he has said. We have set out in an appendix a number of passages from the disclosure, which relate to the "activation" of milk to produce Vitamin D. These very fully describe that process (there are other passages specifically devoted to "sterilization"), and it is so apparent from a mere reading of them that the process was conceived in general as requiring "multiple exposure," that it cannot be necessary to labor the argument. The same was true of all the original claims except Claims Ten to Sixteen, inclusive. Claims Ten and Twelve were substantially alike; they were both to "induce beneficial properties" in the milk by exposure for only a "fraction of a second"; and in Claims Eleven and Thirteen, which were also alike, this period was enlarged to "less than eight seconds." These four claims, being general as to the number of exposures intended, would have had to be read upon, and confined to, the disclosure; and they add nothing to the plaintiff's argument that the specifications from the outset foreshadowed the claims in suit. On the other hand, original Claims Fourteen and Fifteen, again substantially alike, prescribed "one or more" exposures, as did Claim Sixteen; and it was upon these and upon a passage in the disclosure, which we quote in the margin,[2] that the applicants relied when they later introduced the claims now in suit.

---

[1] 67 F.Supp. 587.

[2] Lines 62–75, Col. 2, Page 6, Lines 1 and 2, Col. 1, Page 7:
"We have also found that when the irradiation is properly controlled we can produce in milk a substantial increase in the vitamin D effect with a single exposure of about 1/20 of a second. In one of these experiments the vitamin D content produced was ten units per quart with one exposure 1¼ inches from the ray source above described and in a layer of milk 3/32 of an inch thick over an area of about twenty square inches. When we applied our cyclic method and exposed eight times with short exposures of 1/20th of a second each time, we obtain a substantial increase in the number of vitamin D units with each exposure and a high vitamin content at the end of eight exposures."

The meaning of this passage, especially when it is read together with the paragraph which just preceded it, is that a single exposure, "when the irradiation is properly controlled," will result in a "substantial increase" in vitamins; and that "increase" was described as equal to "ten" Steenbock, or 30 U. S. P. "units." That meant that, if you were content with that much "activation," one exposure would do; but that, since the effect of successive exposures was cumulative, if you wished more than the 30 U. S. P. "units," you might apply the "cyclic method"; i.e. repeat the exposure. If you repeated it eight times, you would get "a substantial increase * * * with each exposure, and a high vitamin content at the end." The preceding paragraph spoke more quantitatively; if you repeated the exposure twenty-five times you would get 300 U. S. P. "units." (Obviously, the increase, though cumulative, would not be in proportion to the number of exposures.) These claims could, therefore, only have meant to cover the first modest "increase," when they spoke of "treating milk" by one exposure; and similarly Claim Sixteen, when it spoke of "activating and sterilizing milk" by one exposure. Thus it appears, not only that the disclosure in general prescribed "multiple exposure," but that in the only instance in which a single exposure was suggested, it declared affirmatively that a very low degree of "activation" would result. From one end to the other of the specifications, they did not even intimate the possibility of obtaining 400 U. S. P. "units" by one exposure; indeed, they were to the contrary.

Claims Thirteen and Fourteen in suit were introduced into the application on March 22, 1935, less than two years before the Creamery Package machine was proved to have gone into public use, and a fortiori before the advent of the Hanovia machine. These claims were not expressly for one exposure, though they could have been read to cover one exposure after the disclosure had been amended as it was on July 26, 1936. When introduced, merely as matter of interpretation, they would, like Original Claims Fourteen, Fifteen and Sixteen, have confined the single exposure process to the production of a low "activation." This appears from an analysis of Claim Thirteen, which will serve as a sample for all three. It says that the "desired potency" may be obtained for the whole volume of milk by exposing only a "fraction" of the layer to the rays, the layer as a whole being too thick to be penetrated. That was true enough, if the "desired potency" was in the neighborhood of the 30 U. S. P. "units"; but if a greater "potency" was "desired," the disclosure, as it then stood, declared that the exposure must be repeated. Certainly it would be contrary to every canon to interpret such a claim as covering the infringing processes. However, the vice goes deeper, because, even though we were to assume that the claim could be stretched so far, it would then lack any support in the disclosure; and that, of course, would be fatal to its validity.[3] All such support continued to be absent until the disclosure was finally amended on July 26, 1936, and when that was done, not only did the amendments flatly contradict the disclosure as a whole, but it was too late, for the processes had been in operation for more than two years. Muncie Gear Works, Inc., v. Outboard Marine & Manufacturing Co.[4] is only the last of many decisions which have halted such attempts. Indeed, it is hard to imagine a more glaring effort to introduce into specifications a new and unexpressed invention two years after the art had already made the advance.

Judgment affirmd.

## Appendix

Lines 52-57, Col. I, Page 3: "It is contemplated to effect the successive treating of portions of substances of this character, such treated portions being mixed

[3] Adams Electric Railway Co. v. Lindell Ry. Co., 8 Cir., 77 F. 432, 449; Bird v. Elaborated Roofing Co., 2 Cir., 256 F. 366, 373, 374; Baker Perkins Co. v. Thomas Roulston, Inc., 2 Cir., 62 F.2d 509, 513; Thompson v. Westinghouse El. & Mfg. Co., 2 Cir., 116 F.2d 422, 425; Carl Braun, Inc., v. Kendall-Lamar Corporation, 2 Cir., 116 F.2d 663, 665.

[4] 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

with untreated portions between the successive treating steps in order that the resulting process provides a substance which is relatively uniformly treated."

Lines 23-47, Col. II, Page 3: "Our method relates to the irradiation of substances capable of having beneficial or detrimental effects imparted thereto and comprises treating such a substance with a number of short intermittent exposures to radiant energy emanating from one or more sources or stages of active rays, no one of said exposures being sufficient to give the whole body of the substance the amount of treatment necessary to produce the ultimate desired beneficial results or effects, and mixing the substance between exposures, such that said mixings take place away from the action of the rays to permit one to control the distribution and amount of treatment received by the substance. The proper combination of the time of each exposure or amount of treatment and the number of exposures will give a much better result than that obtained if the same total time of treatment were given without regard to the amount of each exposure. The number of treatments to be given depends on the layer thickness used, the time limits of exposure and the amount of desirable or beneficial effects desired and the amount of undesirable effects that may be tolerated."

Lines 57-70, Col. II, Page 3: "With this understanding our invention, in one of its broad aspects, comprises exposing a substance to the influence of active rays of sufficient effectiveness and for such duration as to give the same a fractional treatment and to impart beneficial effects thereto but for a duration insufficient to impart undesirable effects thereto, mixing said substance after such fractional treatment, and then alternately repeating this cycle until the desired beneficial effects throughout the substance have been attained, these repetitions being less than that required to impart detrimental effects thereto."

Lines 40-45, Col. II, Page 4: "We have discovered that a few or thousands of exposures to radiant energy of short wave lengths may be utilized to produce bene-

ficial effects in a substance when the time of each exposure is only a fraction of a second, as will be hereinafter described."

Lines 73-75, Col. I, Page 5 and Lines 1-10, Col. II, Page 5: "In a general way it can be said that instead of trying to irradiate the complete layer of a substance in one exposure, as is done by those using a thin film or thin stream or by those who agitate while under the action of the rays, we only try to beneficially irradiate a relatively small portion, or, you might say, the surface of the layer or film and then mix the substance while it is away from the action of the rays and thereafter return it again for treatment, repeating the cycle for as many treatments as are necessary to give the results desired."

Lines 17-39, Col. II, Page 5: "We have discovered that this cyclic method of giving a substance fractional or several properly timed short intermittent exposures (in place of one continuous exposure) for a given number of times and mixing between exposures gives us excellent results. We have found that with a given amount of active ray energy to be applied to a substance, the amount of beneficial effect imparted to a substance varies with the number of treatments given. We have also found that as a rule, the number of treatments to which a substance may be safely subjected depends upon the relation between the amount of treatment required to deleteriously affect the substance and the minimum amount of treatment necessary to produce a beneficial effect in said substance. If the time of each exposure is too long, or the amount of treatment too great, then one is obliged to reduce the number of exposures in order to avoid detrimental effects, and consequently the amount of beneficial effects will be less than if shorter exposures and more of them were used."

Lines 44-59, Col. II, Page 5: "Likewise, the time intervals between exposures may be readily predetermined. This is particularly important in sterilizing, because if the time intervals are too great it will enable bacteria to recuperate from the effects of any preceding exposure or exposures. We have found, as already stated, that the layer thickness used when the

substance is presented for irradiation has a bearing on the number of exposures to be given and the time of each exposure. We have also found that the degree of mixing given between exposures will also vary the results. Thorough mixing between exposures gives the most accurate control of the amount of treatment and therefore the best results."